Alexander STAVRIDES
v.
MELLON BANK, N.A., et al.
Civ. A. No. 72–242.

United States District Court,
W. D. Pennsylvania.

Nov. 25, 1975.

Michael P. Malakoff, Herbert G. Shein-berg, Pittsburgh, Pa., for plaintiff.

Alexander Black, Pittsburgh, Pa., for defendants.

OPINION: PLAINTIFFS'
THIRD MOTION FOR
CLASS ACTION

KNOX, District Judge.

The problems posed to the court and litigants under Class Action Rule 23 appear to be endless and increasingly

complex. In each case, it is necessary to examine stacks of briefs, exhibits, depositions and interrogatories, in order to touch all bases and articulate all the facts and reasons which impel certification or denial of a motion for a class action. In *Ungar v. Dunkin Donuts*, 68 F.R.D. 65 (E.D.Pa.1975), Judge Becker of the Eastern District found it necessary to write a 158 page opinion before concluding that a class action should be allowed in a franchise case. The main problem here as there is whether there can ever, as a practical matter, be a class action where the complaint charges a tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. See *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S. Ct. 1252, 22 L.Ed.2d 495 (1969).

If individual coercion must be shown where a tying arrangement is charged, it is apparent that an action such as this must fail as a class action by becoming unmanageable, since individual coercion against the plaintiffs would have to be shown in tens of thousands of cases each of which would be a mini-trial in itself. If, on the other hand, economic coercion can be shown by reliance upon the contract itself which requires tying then the court may find that a class action would be manageable.

The intensive effort that goes into the determination of a class action is shown by the instant case. This action was filed on August 4, 1972. Three claims were advanced with respect to tax and insurance escrow accounts maintained by defendant mortgage lending institutions: (1) conspiracy and combination to monopolize and unreasonably restrain interstate trade and commerce by changing from the capitalization method of accruing taxes and insurance to the escrow method whereby the funds are placed in an escrow account which does not carry interest and which is claimed to be used by the defendant as part of their general funds; (2) claim of an unlawful tie between escrow services and extension of credit, namely, that unless the borrower acquiesced in the method of escrowing tax and insurance money, extension of credit would be denied; (3) violation of the Truth in Lending Act.

Judge McCune of this court, to whom this case was originally assigned, determined that the cause of action based upon the Truth in Lending Act could not be sustained. *Stavrides v. Mellon National Bank*, 353 F.Supp. 1072 (W.D. Pa.1973). This decision was upheld by the Court of Appeals for this circuit in *Stavrides v. Mellon Bank, N.A., et al*, 487 F.2d 953 (3d Cir. 1973). The case thereupon returned to Judge McCune for processing of the other two claims. Determination of the class action issue was postponed until after the Truth in Lending problem had been disposed of and discovery as to the class action issue had been completed. Shortly thereafter, Judge McCune disqualified himself by reason of the Judicial Disqualification Act of December 5, 1974, and the case was re-assigned to this member of the court. Time was then consumed in determining whether the undersigned was also disqualified and thereafter the class action issue was taken up. We have from each side in this case on this issue alone a stack of briefs and other materials approximately nine inches in height. If we were to decide the question solely by the weight by the material submitted, we would have to give the decision to the defendants because they have contributed more to this stack of papers than has plaintiff.

The trail which we must follow in exegesis of the class action issues is a well-trodden one, worn down by the feet of many experienced jurists who have travelled this same road before us. At points on the trail there are signs bearing the strange emblems of "numerosity", "commonality", "typicality", "predominance", "unmanageability" and "superiority" pointing to side trails, every one of which must be travelled and explored before the end of the main trail

is reached. Despite the deceptive simplicity of the laudable purposes of Rule 23, as adopted effective 1966, the result has been a serious drag upon judicial functions. Each judge is required to articulate his reasons with respect to each one of the problems which arise before a class action can be certified or denied.

There appears to be no shortcut. A decent respect for the rights of the litigants in this case compels recognition that a denial of the class action may result in the "death knell" of these claims or on the other hand granting the same may result in saddling the defendants with obligations running into many millions of dollars. It is thus required that the court set forth its thinking with respect to each of the problems entering into a class action determination. We are also aware of the many decisions in this area recently entered by our brethren in this and other districts and by the court of appeals. All of these decisions must be examined and considered in arriving at our conclusion.

As a general observation, we agree with the defendants that as time has gone on and the courts have had more experience with Rule 23 there has been an increasing disenchantment with it. Such disenchantment was evidenced by the United States Supreme Court in *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), which teaches us that the court must not make a preliminary determination on the merits in order to determine who in a 23(b)(3) action should bear the costs of notice under Rule 23(c)(2). Rather such costs must be borne by the plaintiff. The effect of *Eisen v. Carlisle and Jacquelin* naturally has been to place a damper upon the enthusiasts of class actions.

▉ The original praiseworthy purpose behind Rule 23 was, of course, to make sure that people with small claims would be able to obtain an advocate to pursue them against individuals and corporations with ample resources to defend themselves and make the pursuit of the small claim by itself impractical and the cost thereof prohibitive. The problems arising, however, indicate that in some respects the cure is worse than the disease. The experience of the writer of this opinion in *Ostapowicz v. Johnson Bronze Co.,* 369 F.Supp. 522 (W.D.Pa. 1973) is an illustration of such problems although the number of plaintiffs complaining of sex discrimination had been reduced by opting out to only eleven. Nevertheless, the problems of determining damages in only these eleven cases have proved practically insurmountable. The case has been to the magistrate once, taken up by the court on exceptions, remanded to the magistrate for further proceedings and thus approximately a year and a half has been consumed in trying to determine the damages allocable to only eleven claimants and the end has not yet been reached. One can imagine the morass into which this court would be sunk if we had to determine individual coercion in approximately 115,000 borrowers cases. We are cautioned that the fact that damages may prove difficult to assess should not be any bar to permitting a class action on the question of liability.

The courts in the Third Circuit have also shown increasing disillusionment with the class action. See *Tindall v. Hardin,* 337 F.Supp. 563 (W.D.Pa.1972) and *Stewart v. Wohlgemuth* (three-judge court), 355 F.Supp. 1212 (W.D.Pa.1972), where it was held in view of the possible myriad of circumstances involving different claimants for public welfare payments that the test suit route was best. We note that in *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3d Cir. 1974) the Third Circuit opted for the test case route to avoid class action pitfalls.

On the other hand, this being an antitrust action, we do note that many courts have allowed class actions where the same wrong has been done to multitudes of small claimants. See for example *Hawaii*

*v. Standard Oil Co. of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Cusick v. N. V. Nederlandsche, etc., Ltd.,* 317 F.Supp. 1022 (E.D.Pa. 1970); *Philadelphia Electric Co. v. Anaconda American Brass Co.,* 43 F.R.D. 452 (E.D.Pa.1968); Manual for Complex Litigation Section 143.

The court is also impressed with the fact that the Court of Common Pleas of Allegheny County, Pennsylvania, in an action brought by many of these plaintiffs against many of the same defendants alleging creation of a trust, or violation of an implied contract or in the alternative asking for the imposition of a constructive trust under state law involving the same type of escrow accounts covering insurance and tax installment payments as here involved has held that a class action should proceed. This was following the decision of the Supreme Court of Pennsylvania in *Buchanan v. Brentwood Federal Savings & Loan Association,* 457 Pa. 135, 320 A.2d 117 (1974) reversing the Allegheny County court for dismissing the case upon demurrer. The Supreme Court held that the complaint could not be dismissed on its face in view of its allegations as to trust relationships, constructive trusts and/or implied contract although the decision of the Third Circuit with respect to the Truth in Lending Act in holding there was no cause of action was followed (*Stavrides v. Mellon Bank, N.A.,* 487 F.2d 953 (3d Cir. 1973). The Supreme Court held that if the action was to continue as a plaintiff class action, the court must limit each class of plaintiffs to those holding mortgage or personal bond agreements having monthly tax payment clauses that do not differ materially and prescribed the tests under the Pennsylvania Rules of Civil Procedure for allowing a class action to proceed. The court further held that a defendant class should not be permitted under Pennsylvania Rule 2230.

It will be noted that the Pennsylvania Rules of Civil Procedure, viz: 2229(a), 2230 et seq., provide for a class action in the state courts with the only requirements being: (1) numerosity, (2) adequacy of representation and (3) common questions of law or fact. In Allegheny County, the court upon remand reviewed all the Pennsylvania requirements which are substantially different from Federal Rule 23 and held that a class action should be allowed. The court said at page 123, Pittsburgh Legal Journal 232 (No. 2781, January Term 1972):

> "Class actions are based upon sound equitable principles. To permit defendants to contest liability in separate individual lawsuits where, as here, the claims are small and virtually identical, is the evil that Rule 2230 was promulgated to prevent. In Buchanan, the Supreme Court cited and quoted J. Pomeroy, A Treatise on Equity Jurisprudence, § III at 143 (5th ed. S. Symons, 1941): 'Equity has followed the true principles of contriving its remedies so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated.' Pa.R.Civ.P. 2230, cast in equity, is uniquely well suited to the proper handling of class Plaintiffs' claims in this case."

While the Federal Rules have different requirements for a class action, nevertheless we recognize it would be incongruous for these very plaintiffs and defendants to be proceeding pursuant to a class action in the Allegheny County Court of Common Pleas while not permitted so to proceed in the Federal Courts sitting in the same city.

It certainly is questionable if individual claimants would have the interest or resources to see this case through with the result that what may be a large number of meritorious [1] small claims may be

---

1. We are, of course, not expressing any opinion as to the ultimate right of the plaintiffs to prevail in this case.

denied justice if a class action is not allowed.

On the other hand, however, in *Graybeal v. American Savings and Loan Association*, 59 F.R.D. 7 (D.C.D.C.1973), a class action was refused on a mortgage escrow account case in which, in addition to the issues we have here, there were state issues of breach of contract and usury. The Sherman Act issues were severed from the case and with respect to the breach of contract, unjust enrichment, usury and fraud issues, it was held that individual questions predominated and therefore under 23(b)(3) a class action was not a superior method of adjudicating the controversy. The class action was denied.

Again, in *Umdenstock v. American Manufacturing and Inventory Company of Oklahoma City*, 363 F.Supp. 1375 (W. D.Okl.1973), the court refused to allow a class action in a mortgage escrow account case holding that such an action was not superior and would become unmanageable. The court said:

"The record discloses that no two mortgages are alike or cover the same property, which is unlike common stock in a corporation where all stockholders possess the same properties. There are many mortgages guaranteed under the Federal Home Loan Bank Act under the Federal Housing Administration Act, under the Veterans Administration Act and other federal governmental agencies. The rates of interest provided in the various notes and mortgages are dissimilar, ranging from approximately 5 percent to 8½ percent per annum. It would constitute an insurmountable problem for the Court to analyze and tabulate the relief, if any, to plaintiffs should this be a class action and should the plaintiffs prevail. The Court takes judicial notice that many hundreds of borrowers live in their homes a short time and then 'pull stakes' and leave; foreclosure then ensues and the same governmental agency acquires title, and then the properties are again sold to a new purchaser. The taxes and insurance continue to pile up and must be paid.

The record in this case discloses that there are thirty defendants, less three which have been dismissed, and none of their operations are exactly alike. The question of law and fact are not common to all borrowers and the claim or defense to the alleged representative parties are different because of the difference in rates of interest, tax obligations and mortgage and note provisions.

It is obvious that the difficulties are monumental which will be encountered in the management of a class action of this type and kind should the class action be maintained. There is a total lack of need of justification for class action proceedings in the circumstances of a Truth in Lending case, and the case would assume an abusive and stultifying extreme as a class action in view of the essentially inconsistent remedy prescribed by Congress as a means of private enforcement.

The Court finds from the record and the reasons stated that the class action request is not superior to private litigants as provided by the act of Congress."

*Umdenstock*, however, was affirmed in part and reversed in part by the Tenth Circuit at 495 F.2d 589 (1974) which ruled that summary judgment on the antitrust claim would not be upheld and remanded the case to the lower court. The circuit stated that it expressed no opinion on the merits of the antitrust claim or the propriety of a class action based thereon. The lower court was affirmed in all other respects.

## I. *Rule 23(a).*

With the foregoing general observations behind us, we will now turn to the particular requirements of Rule 23(a). This Rule which is a mandatory requirement in all cases (See *Wetzel v. Liberty*

*Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975), provides:

"Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

█ This is the easiest part of our task. We find that the requirements of 23(a) for a class action are met in this case.

(1) Numerosity.

█ The rule provides that the class must be so numerous that joinder of all members is impracticable. We now have twenty representative plaintiffs who allege mortgage relationships with ten of the remaining twenty eight defendants. It has been estimated that the number of mortgage borrowers of these defendants amounts to 150,000 obviously too great a number to make joinder practical. Plaintiffs' reply brief at page 59 estimates that the number of identified class members is a little over 115,000 and the defendant appears to agree with the same. See page 77 of defendant's brief. This number is not unmanageable and does not compare with the estimated 700,000 to 800,000 persons involved in *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3d Cir. 1974). Four hundred thousand were held to be a proper number of plaintifs in *Arenson v. Board of Trade,* 372 F.Supp. 1349 (N.D.Ill. 1974). It should be remembered that the names and addresses of these plaintiffs are generally readily identifiable and their addresses readily ascertainable from the books of the defendants. The court does not agree with defendants' argument on page 62 of their brief that

a class of 115,000 is inherently unmanageable and unfair to the defendants. It is true, of course, that some of these parties may have moved away and left no forwarding address. If so, this would, of course, serve to reduce the number of the class members. In *Sommers v. Abraham Lincoln Federal Savings & Loan Association,* 66 F.R.D. 581 (E.D.Pa. 1975), Judge Newcomer certified a class action involving upwards of 300,000 plaintiffs in a similar case. We thus hold that the numerosity requirement is satisfied.

(2) Commonality.

The requirement here under the rule is that there may be questions of law or fact common to the class. It is noted that the rule does not require in subdivision (a) that the common questions of law or fact predominate but only that there be such questions. It appears that the common questions here involved are well stated on page 7 of plaintiffs' brief as follows:

"As to count one, these include issues as to whether defendants conspired or combined to eliminate capitalization as a competitive alternative to the escrow method; whether defendants' elimination of the capitalization method and institution and maintenance of the escrow method fixed the price of mortgage credit; whether the alleged combination or conspiracy otherwise results in an unreasonable restraint of trade or commerce and whether there is the requisite affect on interstate trade or commerce. As to the tying count, the common questions include whether the escrow service is a separate 'product' from the extension of credit; whether each defendant conditioned extension of credit on acceptance of the tax and insurance deposits; and whether a not insubstantial amount of commerce was restrained."

It will be noted from the discovery to date that there are two types of mortgages: (1) the "conventional type"

**430**

and (2) the "insured type" where the mortgages are insured by the Federal Housing Administration or the Veteran's Administration as to which the requirements as to escrow accounts may be imposed by the government. It is indicated that there will have to be two sub-classes consisting of conventional type mortgagors and insured mortgagors. This was the holding in *Sommers, supra.*

(3) Typicality.

From the above discussion, it appears that the claims of the representative parties are typical of claims of the class, with the exception of the possibility that there may be a difference as to insured mortgages and conventional mortgages. If trouble should develop later with respect to this, the court may decertify one or the other of the sub-classes pursuant to the provisions of Rule 23(c)(1) whereby it is provided that an order may be conditional and may be altered or amended before the decision on the merits. We will provide that this order with respect to class action shall be conditional.

The question of typicality closely related to the fourth requirement discussed hereafter that the representative parties will fairly and adequately protect the interest of the class. It appears that the general requirements as to deposit of monthly payments of tax and insurance funds in the escrow accounts of the mortgagors are in general the same. It is noted in *Ungar v. Dunkin Donuts*, 68 F.R.D. 65 (E.D.Pa. decided by Judge Becker in the Eastern District on March 12, 1975,) that claims of each plaintiff virtually track those of the other and this is true here. See *Ungar* page 136. We therefore need spend little time on this question of typicality.

It is noted that there may be questions of the statute of limitations involved in this case because under *Haas v. Pittsburgh National Bank, et al.*, 526 F.2d 1083 (3d Cir. 1975), a nominal plaintiff cannot represent a class plaintiff with claims against another defendant. If no nominal plaintiff has standing on any issue against a given defendant then a class action versus that defendant on this issue should not be allowed. In *Haas*, it was noted that Judge Teitelbaum of this court when he found this situation existing determined that plaintiff *Haas* could not represent card holders of Equibank since she only held cards issued by the other defendant (*Haas*, page 1086). Therefore a nominal plaintiff was directed to be added with respect to Equibank and this was done and held proper by the circuit. It is noted that *Haas* does hold that the commencement of the original class action tolls the running of the statute for all purported members of the class who filed *timely* motions to intervene. From this it can be readily seen that there may be a problem in this respect which will have to be determined hereafter. See also *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975) and *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

(4) Adequacy of Representation.

The fourth requirement of 23(a) is that the representative parties (plaintiffs herein) will fairly and adequately protect the interests of the class.

We have no hesitation in finding that this requisite has been met. The counsel for plaintiffs in this case are known to the court to be competent in this field and profess to be ready, willing and able to carry this case through to a conclusion. The plaintiffs appear to have no interests antagonistic to those in the class. In *Wetzel v. Liberty Mutual Insurance Co.*, supra, the court said at page 247:

"Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified experienced and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."

The plaintiffs here are all in the same boat all having tax and insurance mortgage escrow accounts with various of the defendants and therefore no conflicts are apparent. As stated, there may be a problem with respect to conventional mortgages versus insured mortgages requiring certification of two sub-classes but that can be dealt with later. See *Ungar v. Dunkin Donuts*, 68 F.R.D. 65 at page 138 (E.D.Pa. Becker, J., 1975).

It is true of course that the named plaintiffs must have an actual case against each of the defendants. In *O'Shea v. Littleton*, 414 U.S. 488, 94 S. Ct. 669, 38 L.Ed.2d 674 (1974), the court said:

"Moreover, if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."

See also discussion under "typicality" No. 2 above and *Haas v. Pittsburgh National Bank*, supra.

For the above reasons, we find that the four prerequisites to a class action under Rule 23(a) have been met and we now turn to the requirements of subsection (b) and the various subsections thereunder.

## II. *Rule 23(b)*.

Having determined that the mandatory prerequisites under 23(a) are present in this case, we now pass to the question of the application of 23(b).[2]

This is the most troublesome part of the class action decision in this case, and the one which causes the most trouble in making such determinations in almost any case. As was well stated by Circuit Judge Rosenn in *Wetzel v. Liberty Mutual Insurance Co.*, supra, (page 248): "Whether (b)(2) or not (b)(2) is indeed *the* question."

Fortunately, we have ample guide posts in the decisions of our own circuit in *Wetzel*, supra, *Katz v. Carte Blanche*, supra, and *Haas v. Pittsburgh National Bank*, supra, to guide us on our way through the thicket.

On the face of things this case would appear well adapted to class action treatment since it involves the claims of tens of thousands of mortgagors against most of the banks and building and loan associations in Allegheny County, Pennsylvania, claiming that they have wrongfully been deprived of interest on tax and insurance escrow accounts. The issues are the same for the members of the class as set forth in the complaint in this case with two causes of action left:

**2.** (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(1) a claim of conspiracy in restraint of trade engaged in among the lending institutions in Allegheny County to impose these escrow requirements upon mortgagors and (2) a claim of a tie-in between the extension of credit and the escrow payment requirement. If true, these constitute violations of Section I of the Sherman Act (15 U.S.C. 1).

We are cautioned under *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) not to make an elaborate analysis of the merits at this time which would include market power as to the second cause of action, the tie-in, but only to determine whether the claims on their face appear to furnish a sufficient basis for class action.

This matter has been well covered by Judge Newcomer of the Eastern District in *Sommers v. Abraham Lincoln Federal Savings & Loan Assn.,* 66 F.R.D. 581 (E.D.Pa.1975) in which the causes of action appear to be identical with those involved in this suit. In Sommers he held that the question of economic coercion applied to the individual plaintiffs was no barrier to the allowance of a class action, that class actions should be allowed, but two subclasses should be certified, one involving insured loans and the other involving conventional loans. He finds that a class action is particularly adaptable to antitrust cases where the same conspiracy and tie-in is operating on large segments of the population with the same effects. He, however, places the case under (b)(3) instead of (b)(2) distinguishing *Wetzel* supra as being a sex discrimination case not an antitrust case; in an escrow account case such as this damages are the predominant factor and therefore the case should fall under (b)(3) instead of (b)(2). Judge Newcomer agrees that if individual coercion is an element of tying then there should be no class action but otherwise he follows the decision of Judge Becker in *Ungar v. Dunkin Donuts,* supra, that individual economic coercion is

not the decisive factor in a suit involving tying.

This court also agrees that if individual coercion is an element of the plaintiff's case then individual questions would predominate over common ones and certification under (b)(3) would be inappropriate. This is so because it would be obvious in such a case that as to the tying aspect the litigation would immediately break down into tens of thousands of mini lawsuits to determine whether economic coercion was applied to an individual claimant and a class action would not be superior and would become unmanageable.

■ The court agrees with Judge Hunter *In re Transit Co. Tire Antitrust Litigation,* 67 F.R.D. 59 (W.D.Mo.1975) that if significant separate issues are likely to develop, then there should be no class action.

The court is aware that in *Ungar,* supra, a certificate for an interlocutory appeal was approved by the Third Circuit on May 7, 1975, and this question is presently before that court. This, however, does not relieve us from the need of pressing forward with the case at bar which has already been pending approximately three years and which should proceed to trial as rapidly as possible considering the magnitude of discovery still to be engaged in. If the Third Circuit should determine that *Ungar* was wrongly decided, we can always change the certification of a class action under Rule 23(c)(1).

The court is also mindful of indications among various other courts that they will not follow *Ungar* such as *Plekowski v. Ralston Purina Co.,* 68 F.R.D. 443 (M.D.Ga.1975) wherein a claim was advanced that feed purchases were tied to the granting of loans for the purchase of feed and that the tying also was involved in deferment of payments and other extensions of credit.

The court indicated that tying was an individual question of coercion under

*Fortner Enterprises v. United States Steel Corporation,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) and criticism is made that *Ungar* does not deal with tying in terms of causation as required by *Zenith Radio Corporation v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). It is further pointed out that if there are significant questions not only of damage but also of liability a class action is not appropriate. See also *Bogosian v. Gulf Oil Corp.,* 62 F.R.D. 124 (E.D.Pa.1973) where tying was not connected with a contract and it was therefore held that individual proof as to economic coercion was required to establish the actionable tie-in.

 We have gone directly to the question of the tying problem under the second count in this case because this is critical to the class action under 23(b)(3). Where the principal claims for relief relate exclusively or predominantly to money damages a (b)(3) action is the appropriate subdivision to operate under, (See Advisory Committee Notes to (b)(2), whereas if injunctive or declaratory relief predominates, then a (b)(2) cause of action may be allowed. Rule 23(b)(3) is a difficult section to operate under, requiring as it does additional findings as to predominance of common questions of law or fact (2) that the class action is superior to other available methods for a fair and efficient adjudication of the controversy and particularly (D) the difficulties likely to be encountered in the management of a class action. (Unmanageability).

The plaintiffs cite in addition to *Ungar,* supra, the cases of *Halverson v. Convenient Food Mart,* 69 F.R.D. 331 (N.D.Ill.1975) (apparently not otherwise reported) supporting their position that contractual relationships alone are sufficient to establish individual economic coercion in a tie-in situation justify a class action. In *Halverson* the court said:

"The essence of plaintiffs' claim is that illegal tying arrangements were imposed upon them. Plaintiffs' entire case turns on whether these arrangements indeed exist. They can be shown by (1) proof of contractual obligations imposed in the franchise agreements, or (2) proof that the franchisee was required through his dealings with the seller, extrinsic to any express agreement, to purchase an unwanted product. See *Abercrombie v. Lums, Inc.,* supra, [345 F.Supp. 387 (Fla.)] at 390. Prevailing authorities indicate that these modes of proof also provide a reasonable test for determining the propriety of a class action." (Emphasis added) p. 335.

*Halverson* then went on to quote further from the original decision in *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722 (N.D.Calif.1967), one of the early cases decided soon after the adoption of the 1966 amendments relative to class actions and the Illinois court further said as to this case:

"*Siegel v. Chicken Delight, Inc.,* 271 F. Supp. 722 (N.D.Cal.1967), modified sub nom. *Chicken Delight. Inc. v. Harris,* 412 F.2d 830 (9th Cir. 1969), is the leading authority in class action cases in the franchise area. If the sole question is whether a standardized trademark protection clause, however worded, constitutes a violation of the antitrust laws, a class action is the appropriate mode for testing the legality of the clause for it is the standard form franchise agreement which forms the focal point of the allegedly illegal acts and thus establishes a 'common nucleus of operative facts' permitting class treatment. 271 F.Supp. at 726. Coercion remains a necessary element of an unlawful tying arrangement but it is inferred on a class-wide basis; a contractual provision is coercive in and of itself since it is backed by the force of law. See *7-Eleven Franchise Antitrust Litigation,* 1972 Trade Cases ¶ 74,156 (N.D.Cal.1972)." P. 335.

The argument with respect to contractual agreements being sufficient to

show economic coercion under a tie-in may well be correct. However, it appears to the court that in back of this is a further question as to how the individual plaintiff happened to execute a contract containing this tie-in clause and whether there was individual coercion exercised to force him to sign such a document. If this is the question, then we are still in the situation where we will have tens of thousands of mini lawsuits in this case as we inquire into the circumstance under which each class plaintiff happened to sign the escrow agreement clause in his or her mortgage.

Fortunately, the guidelines which we must follow in order to extricate ourselves from this maze have been recently laid down for us by the Court of Appeals for this Circuit. In *Katz v. Carte Blanche Corp.*, 496 F.2d 747 at 756, the court said:

> "The district court must also determine whether the class action is maintainable under Rule 23(b)(1) or (2) so that it may proceed without notice to or identification of the class members. Our review will determine whether the court properly classified the type of class action in reaching its decision as to class action treatment. E. g., *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972). If the class action is maintainable only under Rule 23(b)(3) the district court must make two additional findings: (1) that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Both findings require the exercise of an informed judgment as to the application of defined legal standards.
>
> The predominance finding requires at a minimum the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate.

We must determine whether the district court has properly identified the factual or legal issues, and has properly identified those which are common. If the district court has properly identified the issues common and diverse, we would undoubtedly defer in most instances to its conclusion as to predominance, since that requirement relates to the conservation of litigation effort, and the trial court's judgment probably will be as good as ours. If the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will ordinarily defer to its exercise of discretion. But if it has not properly identified the issues, and not properly evaluated which are common, the order is not entitled to such deference.

> The superiority finding requires at a minimum (1) an informed consideration of alternative available methods of adjudication of each issue, in a comparison of the fairness to all those interests may be involved between both alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method."

The advantages to be derived from placing a class action under 23(b)(2) rather than the difficult requirements including notice under 23(b)(3) were more clearly delineated by the Third Circuit in *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (1975) wherein the court ruled that a sex discrimination case should be placed under (b)(2) if at all possible. The court held that a (b)(2) class is appropriate where *both* final injunctive and monetary relief are granted. The court further held that a case placed under (b)(2) does not necessarily fall out because it is determined that an injunction is not necessary at the conclusion of the litigation. All that is necessary is that final injunctive relief was originally appropriate to satisfy the requirement of (b)(2). The court held that the language of (b)(2)

does not support the contention that such actions are limited to final injunctive relief or declaratory judgment only. The court said at page 253:

"We therefore agree with the *Van Gemert (Van Gemert v. Boeing Co.,* 259 F.Supp. 125 (S.D.N.Y.1966) principle that an action maintainable under both (b)(2) and (b)(3) should be treated under (b)(2) to enjoy a superior res adjudicata effect and to eliminate the procedural complications of (b)(3) which serve no useful purpose under (b)(2). This principle has been widely adopted in the federal courts. See Moore's, supra ¶ 23.31 (3) and cases cited therein."

On page 6 of the first amended substituted complaint filed in this case, plaintiffs state that they seek for themselves and the class of which they are members "(1) an injunction against continuance of the so-called escrow practice."

Then follow other claims for relief under the Truth in Lending Act and pendent state claims for unjust enrichment in violation of the Pennsylvania usury laws which are presently before the Court of Common Pleas of Allegheny County in *Buchanan v. Brentwood Savings and Loan Association,* supra. The final prayer for relief asks for treble damages for violations of the Sherman Antitrust Act. Under these circumstances, the court cannot say at this stage of the litigation that claims for damages predominate over those for injunctive relief and therefore it is appropriate for the present to certify this as a class action under 23(b)(2) for injunctive or declaratory relief. This avoids the complications which would arise under 23(b)(3) with respect to notice and superiority considering the question of individual coercion in a tying arrangement answer to which may not be known until there is a clear final determination in *Ungar v. Dunkin Donuts,* supra. If it should be determined that individual coercion must be shown in inducing persons to enter into the contractual escrow account provisions, then the unmanageability specter which would arise under (b)(3)(D) would pose such a problem as to impel the court to hold that this obstacle alone would prevent a certification of this case as a class action under 23(b)(3). The court is always in a position to change its certification in the event that later developments would indicate that a (b)(3) action is not as impossible as indicated at the present time. Any order entered will therefore be a conditional order subject to change under 23(c)(1).

While the issues in this case appear the same as those in *Sommers v. Abraham Lincoln Federal Savings & Loan Association,* 66 F.R.D. 581 (E.D.Pa. 1975) in that both cases involve changes by the lending institutions from the capitalization method whereby the monthly installments were deducted from principal debt balances and the shift over to the so called escrow account resulting in loss of interest to the borrowers and also the so called tying practices whereby the escrow service was tied to the extension of credit, nevertheless we differ with the conclusion reached in *Sommers* as to the applicability of 23(b)(2).

*Sommers* at 66 F.R.D. 589 held that such a case was not appropriate for (b)(2) certification. In the light of *Wetzel,* supra, however, and our conclusions as to the unmanageability of a (b)(3) action should it be determined that individual coercion must be shown in connection with the tying, this court has concluded that at least for the present this class action should proceed under 23(b)(2).

With the remaining conclusions of Sommers with respect to (b)(3) this court agrees that with respect to the questions of predominance under 23(b)(3) the common questions of law and fact, viz: the conspiracy and the tying are clearly common to all but differs

with respect to the issue of tying. If individual coercion is a part of each plaintiff's case then a class action under (b)(3) is not superior to a class action under (b)(2) and as a matter of fact would not be superior to a test case method of resolving these complaints. Until the final status of this issue in *Ungar,* supra, is determined, this court can make no firm determination as to superiority of a class action under (b)(3) or manageability of such a class action.

Another good exposition of the problems of a tying action operating as a class action under 23(b)(3) is contained in *Lah v. Shell Oil Co.,* 50 F.R.D. 198 (S.D.Ohio 1970).

"The first predominating fact question is whether or not Shell refused to sell the plaintiff and other dealers Shell gasoline for sale in stations owned by plaintiff and other individuals; or stated otherwise, whether Shell compelled each individual to sign a lease for the duration of a year. That is a question of fact; or, with respect to 140 dealers, it is not one question, but 140 separate questions of fact. Individual inquiry would be required. See *Moscarelli v. Stamm,* 288 F.Supp. 453 (E.D.N.Y. 1968); *Chazin v. Gulf,* 419 F.2d 396 (3d Cir. 1969). While class actions have been maintained in the antitrust field, they have been limited [with the possible exception of *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722 (N.D.Cal.1967), modified *Chicken Delight, Inc. v. Harris (Siegel),* 412 F.2d 830 (9th Cir. 1969)] to cases in which a single question of fact, such as conspiracy to fix prices, furnishes the foundation upon which the individual damage claims rest as a matter of course."

These findings as to class action under (b)(3) or (b)(2) of course pertain only to the question of liability and we are cautioned at this stage not to consider the questions of damages until liability has been determined.

The basic questions in this case can as readily be determined in a class action for injunctive or declaratory relief under (b)(2) as under (b)(3) and we then avoid the question of the death knell problem of the expensive notices required by (b)(3) and (c)(2). Under *Eisen,* supra, the plaintiffs would have to bear the expense of notice to members of the proposed class and this alone initially would run to $15,000 at the present postage rate of ten cents with an additional $4500 expense if, as and when the rate goes to thirteen cents.

We do agree with what Judge Newcomer says with respect to damages at page 591 of *Sommers:*

"*Damages however are undeniably individual in proof.* Nonetheless, we do not believe that the individual damage questions will detract from the efficiency of the *class action device in resolving this controversy.* The proper test is not the amount of time or attention required to litigate these individual questions, since a great amount of time would be consumed in litigating these questions if the class members brought numerous individual actions, but the severability of the issues of liability and damages so that 'the asserted statutory violations can be effectively adjudicated in a class proceeding independent from the proceeding in which individual damages would be assessed.' 3B Moore's Federal Practice ¶ 23.45[2], (1974 ed), at 23."

We further agree with the determination of *Sommers* with respect to the other class action criteria under Rule 23 and what the court said with respect to counsel fees at page 592:

"The damage issues in this case appear to be severable from the liability issues.

Some of the factors listed in 23(b) (3) (A–D) do not apply here. There

is no other litigation concerning this controversy pending in this District. Nor is there any other indication of the 'interest of members of the class in individually controlling the prosecution . . . of separate actions.' 23(b)(3)(A). The desirability of concentrating the litigation of these claims in this court is fully apparent, since the parties are located in this District. Finally, we find that this action, when it is divided into the two subclasses, will be manageable. (This factor is discussed more fully at 592).

Rule 23 also provides that the class action method must be the superior method of trying a suit before it can be certified as a (b)(3) class action. In terms of the four criteria provided in 23(b)(3)(A–D), the class action mechanism seems clearly superior. There is no competing litigation in this District, nor any other indication that class members have an individual interest in controlling separate litigation. A class action here is definitely preferable to a consolidated trial with the prospect of massive intervention or the separate trial of each of the named plaintiff's claims. Although there will be difficulties in managing two subclasses of the size involved herein, they will not be unmanageable."

The court further finds that this case is not maintainable as a class action under 23(b)(1)(A) and (B) since there are no other actions pending nor is there any indication at the present time of interests of other persons not parties to the adjudication in protecting their interests.

The complaint as filed originally sought a class action as to the defendants. However, this request has been withdrawn and we will therefore include in our order a formal denial of the defendant's class action. It is likewise noted that in *Sommers,* supra, at 592, a defendant class action was denied.

We have herein explored the issues under 23(b)(3) so that if it should later appear that (b)(3) is superior, we can readily change the certification.

For the above reasons, an appropriate order will be entered directing that this case proceed as a class action under Rule 23(b)(2) with two subclasses as herein described. The order will be conditional subject to change or alteration as the case progresses. The plaintiff is directed to prepare an appropriate order and submit the same to the court after notice to the defendants within ten days from the date of this memorandum. The order should also provide for denial of the request for a defendant class action.